UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,                    )
                                             )
              Plaintiff,                     )
                                             )
         v.                                  )     Civil Action No. _1:08CV124_
                                             )
EXXONMOBIL CORPORATION,                      )
                                             )
              Defendant.                     )
                                             )

## COMPLAINT

The United States of America ("United States"), by authority of the Attorney

General and through the undersigned attorneys, acting at the request of the

Administrator of the United States Environmental Protection Agency ("EPA"), files this

Complaint and alleges as follows:

### PRELIMINARY STATEMENT

1.      This is a civil action under Sections 107 and 113(b) of the

Comprehensive Environmental Response, Compensation and Liability Act of 1980, as

amended, ("CERCLA"), 42 U.S.C. §§ 9607 and 9613(b).  This is an action against the

ExxonMobil Corporation ("Defendant") related to the Big John's Salvage Site

(hereinafter referred to as "BJS Site" or "Site" unless otherwise stated), located in

Marion County, West Virginia.  The United States seeks recovery of response costs

incurred and costs to be incurred by the United States in response to the release or

threat of release of hazardous substances in connection with the Site.  The United

States also seeks a declaratory judgment, pursuant to Section 113(g)(2) of CERCLA,

42 U.S.C. § 9613(g)(2), on liability that will be binding in future actions to recover further

costs incurred at or in connection with the Site.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1345 and 42 U.S.C. §§ 9607 and 9613(b).

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and (c) and 42 U.S.C. § 9613(b), because the Site is located in this judicial district and the claim arose in this district.

## DEFENDANT

4.      Defendant is a New Jersey corporation.  At times relevant to this Complaint, Defendant owned a portion of the Site.

5.      Defendant falls within the definition of a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

## GENERAL ALLEGATIONS

A.      **The Site**

6.      The BJS Site, consisting of approximately 38 acres, is located in Fairmont, Marion County, West Virginia.

7.      The Fairmont Coke Works Site ("FCW Site"), another Superfund site,  is located adjacent to a portion of property known as the Big John's Salvage Property ("BJS Property"), which is part of the BJS Site.

8.      Defendant ExxonMobil is the lawful successor to the Domestic Coke Corporation ("DCC"), which was incorporated under the laws of Delaware in 1918.

9.      DCC owned the FCW Site at times relevant to this Complaint and

-2-

operated a coke production facility at the FCW Site.

10.     At times relevant to this Complaint, the Green Bluff Development Corporation, Inc. ("Green Bluff"), a wholly-owned subsidiary of ExxonMobil, held title to the FCW Site.

11.     Unnamed Tributary Number 1 ("Unnamed Tributary No. 1"), which flows into the Monongahela River, falls within the boundaries of both the Big John's Salvage Site and the adjacent FCW Site.

12.     At times relevant to this Complaint, Defendant ExxonMobil Corporation owned all or a portion of Unnamed Tributary No. 1, and Defendant owned all or a portion of Unnnamed Tributary No. 1 through its predecessor, DCC, and Defendant also owned all or a portion of it, through its wholly-owned subsidiary, Green Bluff.

13.     EPA has defined the BJS Site to include the BJS Property, which consists of approximately 20 acres, and an area which is vegetated with trees and includes Unnamed Tributary No. 1.

14.     Between approximately 1925 and 1973, the Reilly Tar & Chemical Corporation ("Reilly") or one of its predecessors owned and operated a processing facility for crude coal tar on the BJS Property.  The operations conducted by Reilly on the BJS Property, included, but were not necessarily limited to: (a) crude coal tar was brought to the facility on the BJS Property by railroad tank and was pumped into storage tanks there; (b) the crude tar was separated by distillation and condensation processes, and (c) the coal tar refining process generated waste which was retained on the BJS Property in waste disposal impoundments.

15.    In 1973, Reilly sold the BJS Property to Big John's Salvage, Inc., which operated a salvage and scrap facility that accepted various types of scrap and other materials and containers, including both nonhazardous and hazardous materials and things.  The facility operated on the BJS Property between approximately 1973 and 1984.

16.    As a result of the scrap and salvage activities conducted on the BJS Property, hazardous substances, including, but not limited to, lead dust and mercury-containing oil, were released into the environment and disposed of on the BJS Property.  In addition, drums that contained hazardous substances, including xylene among others, were disposed of on the BJS Property.

17.    During Reilly's ownership of the BJS Property and operation of the facility there, hazardous substances, including, but not limited to polycyclic aromatic hydrocarbons ("PAHs") such as benzo(a) pyrene and phenanthrene were released or threatened to be released into the environment.  In addition, coal tar waste, waste water, and other waste, which contained hazardous substances, were released into the environment as a result of Reilly's operations.

18.    Based upon sampling and analyses and inspections of the Site, EPA determined that surface soil, sediments, and surface waters at the Site revealed the presence of elevated concentrations of hazardous substances, including, but not limited to: PAHs such as benzo(a) pyrene, phenanthrene, naphthalene, and phenol.  Lead, arsenic, aluminum, copper and iron were also found at the Site.  Soil generally throughout the BJS Property became contaminated with the above-listed and other

-4-

hazardous substances and over the years contaminated soil was subject to erosion and migration across parts of the BJS Property and migration off the BJS Property and into Unnamed Tributary. No. 1.  Coal tar seeps were found throughout the BJS Property and in the banks of Unnamed Tributary No.1.  Sampling performed in the areas around and near seeps revealed elevated levels of PAHs such as benzo(a) pyrene, phenanthrene, and pyrene.  Waste from Reilly's operations, as well as other types of liquid waste, were discharged through pipes into Unnamed Tributary No. 1.  In addition, waste from the operations was discharged into ditches on the BJS Property and flowed into Unnamed Tributary No. 1.

**B.    Response Actions In Connection with The Site**

19.    On July 27, 2000, the Big John's Salvage Site was placed on the National Priorities List.

20.    Between approximately, 1983 and 2007, EPA, the State of West Virginia, and one or more private persons conducted various inspections, assessments and studies at or related to contamination at the Big John's Salvage Site.

21.    Various clean-up activities have been performed by EPA, past owners and operators of the BJS Property, and persons and companies that disposed of materials during the operation of the Big John's Salvage scrap and salvage facility. These clean-up activities included, but were not limited to the following:

a.    In 1992, EPA performed clean-up activities at the Site, which focused on the removal of drums that contained hazardous materials.

b.    In 1998, EPA performed removal activities related to oil, anti-freeze and diesel fuel found in pits on the BJS Property.

c.      In 2000, EPA issued a Determination of Threat to Public Health or Welfare or the Environment, under which EPA found that conditions at the Site presented or may present an imminent and substantial endangerment to the public health and welfare or the environment.

d.      Also, in 2000, pursuant to an administrative order, a potentially responsible party performed removal activities to address tons of glass cullet that was disposed at the Site, some of which had to be disposed as hazardous materials at an off-Site facility.

e.      In approximately 2000-2001, a potentially responsible party performed some clean-up activities related to releases from coal tar seeps migrating on and off the Site, which included the excavation of contaminated soil that was left in piles on the Site.

f.      In or about October 2001, EPA mobilized at the Site and excavated additional areas which were actively releasing hazardous substances to the environment.  In addition, EPA performed additional response activities related to the piles of contaminated soil.  EPA continues to evaluate options for addressing remaining piles of contaminated soil at the Site.

22.     EPA, the Agency for Toxic Substances and Disease Registry, and the Department of Justice have undertaken response activities in connection with the Site, including, but not limited to, assessments, monitoring, planning, removal and oversight activities, and enforcement related activities.  EPA continues to perform clean-up activities in connection with the Site.

23.     The United States has incurred response costs of at least $17,411,164.55

in connection with the Site under Section 104 of CERCLA, 42 U.S.C. § 9604.  The

United States' response costs were incurred in a manner not inconsistent with the

National Contingency Plan ("NCP"), 40 C.F.R. Part 300.  EPA continues to incur

response costs in connection with the Site, and such costs will be incurred in a manner

not inconsistent with the NCP.

## CLAIM FOR RELIEF

24.    The United States realleges and incorporates by reference paragraphs 1

through 23 above, as if fully set forth below.

25.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), as amended, provides in

pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the

defenses set forth in subsection (b) of this section --

(1) the owner and operator of a vessel or facility,

(2) any person who at the time of disposal of any
hazardous substance owned or operated any facility
at which such hazardous substances were disposed
of, . . ., shall be liable for --

(A) all costs of removal or remedial action
incurred by the United States Government . . .
not inconsistent with the national contingency
plan; . . . .

26.    The substances and types of waste listed under Paragraphs 16, 17, and

18, as well as releases from coal tar and seeps and glass cullet that contained mercury,

are hazardous substances under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

27.    The substances listed under Paragraphs 16, 17 and 18, the waste

described in Paragraphs 17 and 18, the releases from coal tar and seeps, and glass

cullet that contained mercury were released or threatened to be released into the environment within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). The substances and wastes listed under Paragraphs 16, 17 and 18 and the glass cullet that contained mercury were disposed of at the Site.

28.     The crude coal tar processing operations and the scrap and salvage operations performed on the BJS Property fall within the meaning of  the term "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

29.     To protect the public health, welfare and the environment from the actual or threatened release of a hazardous substance into the environment from the Site, the Administrator of EPA, pursuant to Section 104(a) of CERCLA, 42 U.S.C. § 9604(a), has undertaken response activities with respect to the Site that are not inconsistent with the NCP, including investigations, monitoring, assessing, testing, removal and oversight activities, and enforcement related activities.

30.     Defendant is liable under Section 107(a) (2) of CERCLA, 42 U.S.C. § 9607(a) (2), as an owner of a portion of the Big John's Salvage Site at the time hazardous substances were disposed of at the Site.

31.     Pursuant to Section 107 of CERCLA, 42 U.S.C. 9607, Defendant and any other person who meets the requirements of a covered person under Section 107 of CERCLA, 42 U.S.C. § 9607, related to the Site are jointly and severally liable

for all response costs incurred and to be incurred by the United States with respect to the Site.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests that the Court enter a judgment against Defendant, jointly and severally, as follows:

A.    Enter a judgment against Defendant, pursuant to Section (a)(2) of CERCLA, 42 U.S.C. § 9607(a) (2), finding Defendant liable for the United States' response costs, including Interest thereon, incurred in connection with the Site, and Order Defendant to pay such costs and Interest;

B.    Enter a declaratory judgment as to Defendant's liability that will be binding in future actions to recover further response costs incurred by the United States in connection with the Site; and

C.    Award the costs of this action to the United States and Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
        Division
U.S. Department of Justice

-9-

NATHANIEL DOUGLAS
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources
    Division
U.S. Department of Justice
7611 Ben Franklin Station
Washington, D.C. 20044
(202) 514-4628


SHARON L. POTTER
United States Attorney
Northern District of West Virginia


Assistant United States Attorney
Northern District of West Virginia
U.S. Courthouse and Federal Building
1125 Chapline Street
Wheeling, West Virginia
Tele. No. 304/234-0112


OF COUNSEL:

BONNIE PUGH WINKLER
Senior Assistant Regional Counsel

-10-